DISTRICT OF OREGON
**F I L E D**
July 09, 2021
**Clerk, U.S. Bankruptcy Court**

Below is an opinion of the court.

_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**Michael Stephen Aust** and **Brandy Kay-Lynn Aust**,<br><br>                Debtors. | Case No. 20-61582-dwh7 |
| **State of Oregon, Department of Human Services**,<br><br>                Plaintiff,<br><br>      v.<br><br>**Brandy Kay-Lynn Aust**, aka Brandy Sykes,<br><br>                Defendant | Adversary Proceeding No. 20-06048-dwh<br><br>MEMORANDUM DECISION IN FAVOR OF PLAINTIFF<br><br>NOT FOR PUBLICATION |

## I. Introduction

The State of Oregon, Department of Human Services, seeks to except a debt from the chapter 7 discharge of debtor, Brandy Kay-Lynn Aust. The department alleged that Aust

obtained public-assistance benefits through the use of intentionally false written statements about her financial conditions and by fraudulently withholding information.

Having conducted the trial, and for the reasons that follow, I will enter judgment for the department.

**II.    Facts**

Aust filed three applications for public-assistance benefits, one in each of 2006, 2007, and 2008.[1]

Aust argues that there is no evidence that she filed the applications, but I disagree and find that she did. All three are signed by "Brandy Sykes,"[2] which is her former name. She points out that there is no direct evidence that she signed these forms, which is true in the sense that she did not admit signing them, nor did any other witness testify to having seen her sign them, nor did the state present any unquestioned signatures for a handwriting comparison. But the existence of an application with the signature "Brandy Sykes" is enough to permit me to conclude that Aust, who used that name, did in fact sign it. The inference is not inevitable; it's conceivable that someone else forged her signature. But she has given me no reason to believe that her signature is forged, and I can think of none. In the absence of any evidence or even argument to the contrary, the most plausible interpretation is that the applications are what they appear to be. I find that she submitted the applications.

   *A.    2006 application*

Aust submitted her first application in May 2006.[3] Based on the information she provided, the department awarded Supplemental Nutrition Assistance Program (SNAP) benefits.

---

[1] Trial Exs. 1-3, docket items (DIs) 60-1 – 60-3.
[2] Trial Ex. 1 at 1; Trial Ex. 2 at 10; Trial Ex. 3 at 15.
[3] Trial Ex. 1.

In the 2006 application, Aust said that she was unmarried.[4] In fact, she was then married to Conley Allen Grabontin.[5] But the department has not alleged that this false statement led to any overpayment.[6]

But not long after the 2006 application, Stephen Weinhart moved into Aust's home, and they were married in August of that year.[7] Weinhart was employed[8] and was paying the household rent.[9] Aust breached her duty to report to the department that she had married.[10] If she had truthfully reported that she had married Weinhart and that he was paying the household rent, her SNAP benefits would have been terminated.[11]

In early 2007, Aust and Weinhart had a son together, whose first initial is M.[12]

### B.     2007 application

In March 2007, Aust filed her second benefits application.[13] Based on the information provided in that application, the department awarded benefits under the SNAP, Temporary Assistance for Needy Families (TANF), and Employment-Related Daycare (ERDC) programs. The ERDC benefits were paid to Aust but were intended to defray expenses of childcare that she incurred.[14] ERDC benefits are available only if the person providing the childcare meets certain

---

[4] Trial Ex. 1 at 9.
[5] Trial Ex. 18 (DI 60-18) at 1.
[6] *See* Erica Silberman testimony audio recording (DI 84), elapsed time 20:00–20:30 (marriage to incarcerated husband would not have made a difference to eligibility).
[7] Joint Statement of Agreed Facts and Issues of Law (DI 68) (Stip. facts) at 2.
[8] Stip. facts at 2.
[9] Amended Trial Ex. 9 (DI 75) at 13:13-19.
[10] Trial Ex. 18 at 18 (Aust "stated that she knew if she reported her marriage, her benefits would end").
[11] Trial Ex. 18 at 18.
[12] Stip. facts at 2.
[13] Trial Ex. 2.
[14] Trial Ex. 9 at 23:1-5.

qualifications, including that the provider not be a parent or stepparent of the child being cared for—as explained in the department's childcare guide.[15]

In her 2007 application, Aust failed to disclose Weinhart's income in response to a request whether anyone has income of $150 or more a month.[16] She again stated that she was unmarried,[17] when in fact she was married to him.[18] She provided a list of those who lived in her household, excluding him.[19] When asked if she got help to pay for housing, she did not disclose his payment of her rent.[20] The application form instructed her to identify the parents of her children. She identified her ex-husband, Grabontin, as the father of her first two children. But she identified a man named Norris as the father of M,[21] whose real father was Weinhart.[22] When asked if anyone could get health insurance through an employer, she answered "no";[23] a representative of Weinhart's employer testified that Weinhart did obtain coverage for her, which is consistent with his paystub issued January 11, 2008.[24]

If she had truthfully reported that Weinhart lived in her household, she would not have received SNAP or TANF benefits.[25] And if she had truthfully reported that he was her husband and M's father, she would not have received ERDC benefits; his relationship to her and her children disqualified him as a provider under that program.[26]

---

[15] Trial Ex. 19 (DI 60-19) at 6.
[16] Trial Ex. 2 at 1, part 1.a); Trial Ex. 15.
[17] Trial Ex. 2 at 2 ("Marital Status: Single").
[18] Trial Ex. 8 (DI 60-8) at 1.
[19] Trial Ex. 2 at 2-3.
[20] Trial Ex. 2 at 5, item 7; amended Trial Ex. 9 at 12:8-9.
[21] Trial Ex. 2 at 7.
[22] Trial Ex. 2 at 7; Stip. facts at 2.
[23] Trial Ex. 2 at 9, part 4.
[24] Trial Ex. 15 (DI 60-15) at 100-01.
[25] Trial Ex. 12, 13 (DIs 60-12 – 60-13).
[26] Trial Ex. 11 (DI 60-11).

Page 4 – MEMORANDUM DECISION IN FAVOR OF PLAINTIFF

Based on the testimony of Erica Silberman, an employee of the department, I find that Aust's false statements and deceptive omissions caused the department to pay Aust benefits to which she was not entitled in the following amounts: (1) ERDC benefits totaling $10,182.32,[27] (2) TANF benefits totaling $8,357,[28] (3) and SNAP benefits totaling $8,572.[29] Also based on Silberman's testimony, I find that the balance owed as of Aust's bankruptcy-petition date was $15,863.34, and this amount constitutes a debt attributable to Aust's false statements and deceptive omissions. I further find that Aust made the false statements and omissions knowingly and with the intent to deceive the department. She must have known that she was married to Weinhart at the time of her 2007 application, so her omission of him from her list of household members can only have been intentionally deceptive.

Slightly less certain is the department's allegation that her failure to inform it in 2006 that she had married Weinhart was intentionally deceptive. It's possible that this omission was attributable to forgetfulness. But the fact that she later intentionally concealed her marriage to him when submitting the 2007 application weighs against this innocent explanation. It's therefore more likely, and I find, that her failure to inform the department about her marriage to him was conscious and intentionally deceptive. This conclusion is also bolstered by her later admission, as recorded in the department's case record, that she "knew that if she reported her marriage, her benefits would end."[30] And she must also have known that he lived in her household and contributed to its expenses at the time of her 2007 application. Although her lawyer argues that she did not necessarily understand the meaning of the questions asked in the

---

[27] Silberman testimony audio recording (DI 84), elapsed time 32:00–42:00; Trial Ex. 11 at 5.
[28] Silberman testimony audio recording, elapsed time 32:00–42:00; Trial Ex. 12 at 1, 7-23.
[29] Silberman testimony audio recording, elapsed time 32:00–42:00; Trial Ex. 13 at 1.
[30] Trial Ex. 18 at 18.

application (including the meaning of "household"), I find that the questions were straightforward and within the ability of an ordinary person to understand. She need not have known the technical legal or administrative definition of "household" to understand what that commonplace term meant in the context in which it was used. There is no evidence that she found the forms confusing—her written responses were entirely coherent, albeit false. And the inaccuracies in her responses were not random, as one would expect if she had simply misunderstood the forms. Rather, she misrepresented facts only in ways that were beneficial to her. This strongly suggests that her misrepresentations were intentional and were calculated to obtain benefits for which she was ineligible.

Finally, I have been given no reason to doubt, and therefore I find, that Aust knew that Weinhart was the father of M, and because she was married to him, she necessarily knew that he was at least a stepparent to all of her children. I can't absolutely rule out the possibility that she honestly believed that Norris was M's father. But Aust has not taken the position that Norris really is M's father, or that she ever believed he was. Besides, Aust certainly knew that Weinhart was her husband, which made him at least a stepfather of her biological children.

The department's notes indicate that Aust referred to Weinhart as her "roommate" even though they were married and continued to refer to him that way as late as February 2008,[31] which is hard to explain unless Aust was intentionally concealing her marriage. I find that she intentionally omitted any mention of his relationship to her or to her children so that she could receive ERDC benefits.

I find that the department relied both justifiably and reasonably on Aust's statements.

---

[31] Trial Ex. 18 at 18.

As I mentioned before, Aust filled out the forms coherently and gave no indication that she misunderstood the questions. Nor were her answers implausible or suspicious. The department impressed on her the importance of giving truthful answers, and she was required to sign her applications under penalty of perjury.[32] Under the circumstances, it was reasonable for the department to accept statements made under penalty of perjury as true, subject to later verification.

### III. Analysis

#### A. Section 523(a)(2)(A) and (B)

In the department's complaint, it seeks a determination of nondischargeability under both subparagraphs (A) and (B) of 523(a)(2).[33] Subparagraph (A) excepts a debt for money obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's an insider's financial condition. For a debt for a false representation to be nondischargeable under 523(a)(2)(A), the creditor must prove the representation, its falsity, the debtor's knowledge of its falsity, the debtor's intent to deceive the creditor, the creditor's justifiable reliance on the misrepresentation, and damages, i.e., that the amount of the debt sought to be excluded from discharge was caused by the misrepresentation.[34]

Subparagraph (B) excepts a debt for the use of a statement in writing respecting the debtor's or an insider's financial condition that is materially false, on which the creditor reasonably relied, and that the debtor caused to be made or published with intent to deceive.

---

[32] Trial Ex. 1 at 1; Trial Ex. 2 at 10; Silberman testimony audio recording, elapsed time 11:30-12:30.
[33] Complaint (DI 1) at 3:25-26, 4:11-14, 17-19; Joint Statement of Agreed Facts and Issues of Law (Stip. Facts) (DI 68) at 1:25-26.
[34] *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010); *In re Eashai*, 87 F.3d 1082, 1089 (9th Cir. 1996) (silence regarding a material fact is equivalent to misrepresentation).

Page 7 – MEMORANDUM DECISION IN FAVOR OF PLAINTIFF

The two subparagraphs differ in three important ways. First, subparagraph (B) requires that the statement be in writing, but subparagraph (A) does not. Second, subparagraph (B) pertains only to statements about a debtor's or insider's financial condition, but subparagraph (A) applies to all other kinds of statements and representations. Finally, subparagraph (B) requires that the creditor's reliance on the false statement be "reasonable," but subparagraph (A) has been interpreted as requiring only justifiable reliance.[35]

**B.   *Aust's debts to the department are nondischargeable under either 523(a)(2)(A) or (B).***

For the reasons that follow, each of the benefit-overpayment debts that the department seeks to exclude from discharge is nondischargeable under either subparagraph (A) or (B). Due to the nature of the evidence in this action, it is unnecessary for me to address each misrepresentation or omission individually and determine which subparagraph governs it.

The benefit-overpayment debts that the department seeks to except from discharge are for money.

Each of the misrepresentations or omissions the department relies on was either not a statement of Aust's or an insider's financial condition and thus not excluded from subparagraph (A), or it was a written statement of her or an insider's financial condition and thus not excluded from subparagraph (B).

The misrepresentations or omissions that were not statements respecting financial condition were false, Aust knew they were false, she intended the statements to deceive the department, and the department justifiably relied on the statements. The misrepresentations or omissions that were statements respecting financial condition were in writing, were materially

---

[35] *Field v. Mans*, 516 U.S. 59, 73 (1995).

false, the department reasonably relied on them, and she caused the statements to be made or published with intent to deceive the department.

The debt amounts that the department seeks to exclude from discharge arose from misrepresentations or omissions as to which the elements of subparagraphs (A) or (B) are otherwise satisfied.

## IV. Conclusion

Aust's debt to the department is excepted from her discharge under section 523(a)(2)(A). I will enter a separate judgment.

###